# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

United States Courts
Southern District of Texas
F I L E D

OCT 22 2020

David J. Bradley, Clerk of Court

| | | |
|---|---|---|
| SHEILA OWENS COLLINS | § | Civil Action No.: |
| Plaintiff, | § | |
| | § | |
| | § | |
| v | § | |
| | § | |
| JUDGE MICHAEL NEWMAN | § | |
| Individually and in his official capacity | § | |
| as Justice of the Probate Ct., #2 of Harris | § | |
| County, | § | Jury demand |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |
| | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

**COMES NOW** Plaintiff, Sheila Owens Collins, Proceeding Pro Se brings this action against the above Defendant; Plaintiff alleges the following based upon information and belief, the investigation of counsel, and personal knowledge as to the allegations pertaining to themselves.

1

## 1. INTRODUCTION

1.        This case is about violation of Civil Right, human dignity and how we treat the most vulnerable among us. Having nowhere else to turn, Plaintiff brings this action to address the numerous violations of her Civil rights and her constitutional protected rights.   Defendant exploited Plaintiff by subjecting her to conditions and mistreatment that are nothing short of vile. This action seeks to end the defendant's abuse of Plaintiff.

2.        Defendant's acts and practices, as described herein, constitute unlawful treatment, judicial rascality, fraudulent, or unfair judicial practices, in that (1) Defendant's practices violated numerous statutes as described in this Complaint; (2) the justification for Defendant's conducts are outweighed by the gravity of the consequences to Plaintiff; (3) Defendant's conducts are immoral, unethical, oppressive, unconscionable, or substantially injurious to Plaintiff, and/or; (4) the uniform conduct of Defendant has a tendency to harm Plaintiff.

## 2. PARTIES

3.        Plaintiff Sheila Owens-Collins (Dr. Owens-Collins) is an adult female citizen of the United States and a resident of Maryland. She brings this suit because of the repeated violation of her civil rights, reckless abuse of power, racial and gender discrimination, failure to maintain fiscal responsibility to preserve the estate of her Mother (Hattie Owens).  She also brings this suit because of the gross medical negligence, violation of ADA protections, violations of the Texas Estates Codes for her mother by the court appointed attorneys that led to a forced admission to Hospice and an early and

2

preventable death. The court appointed attorneys' actions and non-actions were supervised and sanctioned by the defendant, and in alignment with the siblings and niece of the Plaintiff. The court conspired and colluded in actions that caused the loss of life for Hattie Owens and loss of a mother for Dr. Sheila Owens-Collins.

4.      Plaintiff is informed and believes and, on that basis, alleges that Defendant Michael Newman (Hon. Judge Newman) is and at all times relevant is/was a presiding Judge in the Probate Court No. 2 of Harris County, Houston, in the state of Texas.

## 3. JURISDICTION AND VENUE

5.      This Court has jurisdiction under 28 U.S.C. §§ 1331, and this Court has jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367. Declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201, 2202, and 1343.

6.      Venue is proper in this Court under 28 U.S.C. § 1391 because Defendant in this action is located and reside in this judicial district and Defendant resides in the State of Texas.

7.      Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in this district.

8.      No administrative exhaustion or other conditions precedent are required prior to the filing of claims and all required conditions precedent required have been exhausted and/or performed by Plaintiff prior to the filing of this complaint.  This includes, not exclusive filing a complaint with the State Commission on Judicial Conduct.

## 4. FACTUAL BACKGROUND

9.      This case highlights the failures of the public entity known as the Harris County Guardianship and Probate court system, as well as the failures of the agents and appointees of the Harris County guardianship program and subsequently the probate court arm under both Texas state law, and the American with Disabilities Act (ADA), for the acts and omissions of the Harris County guardianship program and violations of the ADA involving the following agents, administrators, and appointees: Michael Newman-presiding judge of Probate Ct., #2,. Pursuant to the liabilities of Mr. Newman and the duties of position set out in the Harris County guardianship and probate court program whose mission is to protect the elderly, especially those who fall into the category of the protections of the ADA and finally to probate the will of the decedent according to the testator's wishes and in accordance with the Texas Estates Code.

10.     The claim against the Hon. Judge Newman, is specifically for; failure to fairly adjudicate excessive claims for expenses and reimbursement from the estate of Hattie Owens, an elderly citizen with the disability of total deafness who is owed ADA protection.

11.     Abuse of discretion in allowing monies from the estate to be paid to appointed attorneys despite evidence that there were deficiencies in their job

4

performance and in their fulfillment of the ethical, financial, and legal obligations to the Ward.

12.     Specifically, Hon. Judge Newman abused his discretion by closing the guardianship prematurely before the estate was satisfactorily settled by all stakeholders.

13.     He demonstrated an overall bias to the court appointed attorneys, their representatives, and disgruntled family members who gave the appointees misinformation that they acted on to further isolate and violate the Ward's constitutional and ADA rights for the joint purpose of speeding up the Ward's demise to have early access to her assets and made statements in open court that were untrue, inflammatory, defamatory, and uncivil.

14.     Hon. Judge Newman allowed Attorney Tim Berlinger to rant long enough to leave a false impression of the Plaintiff that was unprofessional and discriminatory.

15.     Hon. Judge Newman allowed a toxic environment in the court proceedings by allowing Guardian ad litem to spew inflammatory remarks about the plaintiff that were defaming, unprofessional, patently false and unsubstantiated.

16.     The court proceeding became toxic with wild allegations, personal slander and unprofessional behavior which included spewing out wild allegations of activity by the plaintiff that were totally untrue and intended to

divert attention away from the fact that he had not done the job that he was asking reimbursement for.

17.     He explicitly said that he did not do his job because the plaintiff was so" dysfunctional". The comments were "slanderous and defaming". The judge did little to bring civility, truth and honor back into the proceeding, in a way that wasn't discriminatory.

18.     There was evidence presented that the Temporary Guardian withheld a device that provided additional hearing capacity to a deaf person which is in direct violation of the tenants of the ADA, including the responsibility to call out that behavior and not overlook it.

19.     Neglect, isolation, ignoring of the stated wishes of the Ward, financial and legal incompetence were demonstrated across the board and evidence submitted that substantiated the claims that were ignored in favor of the appointed attorneys.

20.     failure to provide findings of facts and conclusions despite two requests which left the plaintiff in the dark. Plaintiff was denied of a jury trial, as guaranteed by the Seventh Amendment to the Constitution and as requested to defend the contested Will of the Ward who has now become a Decedent.

21.     Hon. Judge Newman declared that the plaintiff was "not qualified/unsuitable" to serve as the first named executor. The stated reason of "family rancor" is unreasonable and not substantiated by case law. The siblings have been disgruntled all of their lives and the Testator was aware of

this and named family members that she trusted to carry out her last wishes. The Judge is arbitrarily non-compliant with her wish in favor of channeling more monies out of the estate to the detriment of the beneficiaries. He has already signaled that the 2nd named Executor, who happens to be the Plaintiff's son, and Decedent's grandson will not be named Executor at the abuse of his discretion. This action is both biased and discriminatory. It is non-compliant with the expressed wishes of the Testator in her Last Will and Testament.

22.      This claim arises out of a contested guardianship proceeding. Application was made by the proposed Ward's granddaughter. (1 CR 10). The proposed ward's objection to guardianship and alternatives to guardianship that had been in place for several years. (2 CR 191 ). The proceeding was unresolved more than a year later when the proposed Ward died. (3 CR 323).

23.      The proposed Ward's daughter challenges the fee side by court appointees and presented expert testimony that many of the fees were not earned by performance of statutory duties and they were not reasonable or necessary. ( 3 CR 13 ). The trial court overruled the challenges and, in a series of orders, awarded appointees approximately $90,000 in fees and expenses. The orders were made without notice to the Plaintiff, Sheila, the proposed Ward's daughter, and without some of the fee request having been served on her. (3 CR 130, 132, 135, 137, 138,209).

24.      The case is currently in the Texas Court of Appeals for the First Judicial District of Texas.  The Judge refused to give the Findings of Fact and Law after two requests and has yet to do so, which decreases the transparency and

trust in the judicial system by the lay community that is supposed to be served. It should be noted that fees were awarded to the temporary guardian for services that were in her own interest and not that of the proposed ward, which again demonstrates an abuse of discretion and disregard for an estate that two African American Educators, Emiel and Hattie Owens, spent their life building. This caused an undue diminution of the estate and a disservice to the beneficiaries.

25.     After the death of the proposed Ward on January 1, 2019, a Will that was executed in 2011 was presented for probate.  Reflexly, the same family members that objected to the Plaintiff being named as the Guardian as was the adamant choice of the proposed Ward and is indicated in many interviews that she had with appointed attorneys, investigators, court appointed physicians to perform IME exams for competence, objected vehemently to the validity of the will and to the appointment of the Testator's choice for the 1st Executor. They contested the will on 3 charges:

        1.  It was forged

        2.  The Testator did not have testamentary capacity

        3.  The Testator was under undue influence by the Plaintiff.

26.     The allegations, made by the four disgruntled family members, were proven to be false and the Will was determined to be valid. The defendant, the Honorable Judge Newman then ruled that although the Will was admitted, "there was no one in the family that was qualified to be Executor".  Because Plaintiff was the only one on trial and the only one named as the 1st Executor, the statement applied to Plaintiff. This is confirmed by a handwritten note that the grand daughter (Aisha Ross) sent to the Appellate Court announcing that

Plaintiff had been found to be "unsuitable".   The defendant stigmatized the Plaintiff with this label, which the disgruntled niece is using to further defame the hard earned professional and personal reputation of the Plaintiff, in favor of keeping up the collusion with the appointed attorneys that has been pervasive throughout the whole ordeal..

27.     This note although very improper was intended to garner support for the appointed attorneys who were very negligent in their duties to the proposed Ward, suggests a perceived bias of the judge in favor of the disgruntled siblings and appointed attorneys and unreasonable, arbitrary and discriminatory to the Plaintiff. " Family rancor" was used as a cover for his bias and the disdain that was demonstrated by the entire Guardianship and Probate Court to honor the wishes and constitutional rights of  an elderly citizen under the provisions of the US Constitution, the American Disability Act, and the rules and regulations governing the Texas Guardianship and Estate Codes.

## 5. STATEMENT OF CASE

28.      Hattie B. Owens was born in 1928 and lived in Harris County with her husband Emiel Owens. They raised four children, daughters Sheila Owens Collins and Angelia Sapp, and sons Emiel Owens, Jr. and Mel Bernard Owens. (1 CR 11). In 2008 Emiel Sr. died. (9/19/18 RR 7).

29.     In 2011, Hattie was 83 years old still living in her own home. To assist her in handling her affairs she executed a durable power of attorney and Will naming her daughter Sheila as her agent, and a her grandson Roy Collins, as

the first alternative agent, and her grandson Gerome Sapp as the second alternative agent. (1 CR 128). Sheila was also a joint owner of Hattie's checking account. (2 CR 209). Pursuant to that authority, Sheila hired caregivers for Hattie (1 CR 120, 2 CR 94, 109, 142-160), and paid expenses related to Hattie's home (2 CR 105, 125-140).

30.     By then Sheila had been a medical doctor for some time. She was living in Maryland but often traveled to visit her mother. (2 CR 219). Hattie relied on Sheila who was financially stable (12/20/17 RR 12, 33) and whom she trusted. Sheila had helped Hattie define and limit the financial support Hattie would provide for other family members who turned to her for assistance. Specifically, Sheila sought to have Hattie's daughter Angelia make a written agreement for specific financial support conditioned on Angelia meeting some conditions. (1 CR 142). This understandably resulted in conflict within the family. It was not the only conflict. By 2014, Hattie's son Emiel, Jr. had sued Hattie concerning family property in Waller County. (3 CR 60).

31.     In 2016 and 2017, Sheila spent approximately $164,000.00 to make repairs to Hattie's home in Houston. (1 CR 187-88). Substantial funds were funds loaned or given by Sheila for the work and other expenses of Hattie. (1 CR 121, 224). Following that work, Sheila was reimbursed some of those funds from the joint account. (1 CR 27; 12/20/17 RR 8). The following August, when Hattie was 89, Hurricane Harvey substantially damage the newly remodeled home. Because she could not live in the home, Hattie stayed with her granddaughter Aisha Ross for a period of time(1) before moving to an assisted living center while repairs were made to the home. (1 CR 183).

32.     During that time Aisha was assisting Hattie with some immediate tasks including insurance claims. (1 CR 182). Aisha alleged that she learned the house insurance payments were delinquent. (Id.)  This was later proven to be untrue.  There was no lapse in insurance coverage of the house. According to Aisha, Hattie's bank account statements were being sent to Sheila, so Aisha took Hattie to the bank to obtain statements. (1 CR 183).

33.     Aisha looked at the recent statement and, on seeing the reimbursement transfers from the account to Sheila, and without contacting Sheila for an exclamation, Aisha concluded that Sheila was misusing her authority under the power of attorney. (1 CR 183).

34.     The parties dispute the length of time Hattie stayed with Aisha.  Sheila asserted it was 2 days (1CR) while Aisha alleged it was "almost a month." (3 CR). A handwritten note by Hattie Owens and a video clip of an interview with Hattie Owens during which she describes being "coerced" by Aisha and her husband, states that she was in their apt. only 2 days, and that Aisha's report that it was a month is patently false evidence.

35.     Aisha took Hattie to an attorney to have her execute a new durable power of attorney adding Aisha as an agent.  That document, which was 18 single spaced pages long, also purported to revoke the 2011 power of attorney. ( 1 CR 165 ).  Aisha also had had Hattie execute a medical power of attorney naming Aisha and Sheila as agent to make medical decisions jointly.(1 CR 145 ). This was a source of further conflict. September 16, 2017 Hattie moved to a senior living facility to await repair of her home. (1 CR 183).

## Application for Guardianship

36.     Just after that move, Aisha made a complaint to the Department of Family and Protective Services alleging misconduct by Sheila. (1 CR 149; 2 RR Ex. 1, pg. 5). The following month, in October 2017, Aisha filed an application seeking appointment as permanent guardian of Hattie's person and estate. (1 CR 10). She alleged that Hattie was totally incapacitated and there were no feasible alternatives to guardianship and further alleged Sheila had engaged in misconduct. (1 CR 11-12). The declaration of "total incompacity" was made 2 days after Aisha took Hattie to the attorney to have the POA modified.  There were no issues of capacity at that time.  The declaration of incompacity was made in retaliation for having her name removed from the POA, as was the filing of false claims with APS.

37.     Five days later Aisha filed an application for a temporary restraining order and an application for the court to appoint her as temporary guardian and suspend the powers of attorney, including those given to Sheila. (1 CR 16-18).  There were no arrangements made for bills to be paid during the time of suspension of the bank account which resulted in the threat of eviction from the Assisted Living Apt. that Hattie was staying in while waiting for her home to be repaired. Neither Sheila or Hattie were told that the account was frozen until the bills were 2 months in arrears.

38.     The trial court appointed an investigator(1 CR 15) and named attorney Hattie Shannon as attorney ad litem for Hattie Owens.  Hattie Shannon appeared at the hearing minutes before it started and announced the threatened eviction of Hattie Owens.  She had not returned any calls from Sheila or her

counsel the week prior to the hearing. They weren't sure that she was going to come. She came and announced that the bills had not been paid, implying that Sheila was neglectful. Hattie Owens sensed that she was unprepared and asked the judge to approach the bench because of her hearing disability, she wanted to make sure she heard what was being said and to make her wishes very clear that she did not want or need a guardian, and if she had to have one, she wanted her oldest and trusted daughter to serve that role.

39.     Sheila filed a response to the applications which disputed the need for a guardianship and that the durable power of attorney and joint account were less restrictive means adequate to meet Hattie's needs. (1 CR 25-27). Alternatively, Sheila alleged Aisha's criminal history disqualified her from serving as guardian in the event the court determined the need for temporary or permanent guardianship. (1 CR 28). Sheila provided a physician's certificate showing no deficits in most areas. (1 CR 30).

40.     The investigator filed a report December 19, 2017 which recited some of the history set out above, including the powers of attorney and Hattie's housing. (1 CR 38). It reflected that Hattie believed the assistance of Sheila was adequate and (Id. At 23). She was unequivocal that Sheila provided for her and was the sole person she depended on. (Id). She detailed the steps Sheila used in helping Hattie make decisions and that she had no concerns about Sheila's actions in the past and continue to rely on her. (Id. At 24). Hattie even describe the allegations against Sheila as efforts to slander Sheila. (Id. At 25).

41.      In spite of the absence of service of citation in accordance with the Estates Code or evidence admitted at the hearing in support of the application, the trial court appointed a temporary guardian, Dana Drexler. (Id. at 26; 4/29/19 – 3 RR Ex. C-5). The court also granted the application for an additional independent medical examination in the absence of evidence. (Id. at 26). The attorney ad litem did not object to either. The record does not support later claims that at this hearing the trial court ordered Sheila to make an accounting of her actions under the power of attorney

42.      Hattie underwent a second medical examination in January 2018 which reflected a finding she was partially incapacitated. (1 CR 48). In February the trial court appointed attorney Tim Berlinger as guardian ad litem for Hattie. (1 CR 53). An attorney filed an appearance as retained counsel for Hattie in February 2018 (1 CR 51) but had withdrawn by May 2018. By that time Hattie had undergone three medical examinations. (1 CR 33, 54, 85). This last IME was ordered by Dana Drexler while Hattie was in the hospital recovering from an acute kidney injury, which caused her to be lethargic due to an electrolyte disturbance.

43.      This exam was done without the necessary permissions by the court or the Ward.  The examiner, Dr. Merkel was very rude to Plaintiff's mother and to her when Plaintiff called to discuss her mother with him. After a brief time of approximately 20 mins. he told Plaintiff's mother that she had flunked and that he was in a hurry to get to another appointment.  He told Plaintiff that he was going to rubber stamp the prior exam. This hoaxed exam was in response to Plaintiff's mother retaining her personal attorney.  The incomplete and unauthorized exam caused Hattie to advance from "alleged incapacity" to an

"incapacitated person".  The personal attorney was bullied into resigning after this finding.  Tim Berlinger responded in a brief with incredulity that Hattie sought an outside attorney when she had a court appointed one.  The lack of advocacy by the court appointed attorney didn't matter, nor did her right to hire an outside personal attorney.

### The Temporary Guardianship is Continued

44.      When the case had not concluded the following August, Sheila hired a new attorney. (1 CR 96). In September the temporary Guardian, Drexler, filed an application for appointment of a permanent guardian. (1 CR 104). She also sought extension of the temporary guardianship which would have terminated automatically in September. The trial court conducted a hearing on that request September 19, 2018. At that hearing Drexler told the court that continuance of the case was expensive and "this case should come to an end." (9/19/18 RR 8).

45.      Sheila asked to testify and authenticate records she offered to show there had been no misuse of the power of attorney by her. The documents were offered to address the allegations in the original application for guardianship. (9/19/18 RR 12).

46.      Sheila attempted to argue that if the original application had no basis and continuation of the temporary guardianship was unnecessary. The trial court refused to admit the exhibits or permit her to testify on the issue. (Id. at 14). It heard no evidence and ordered the parties to schedule mediation. (Id. At 15). It also signed an order continuing the temporary guardianship. (1CR 116).

47.     Following that hearing Sheila filed a written response to the allegations in Aisha's petition and a voluminous accounting of expenses incurred and financial transactions from at least 2015. 3 (1 CR 119-304; 2 CR 1-213). The response recited the factual history from 2011, including the litigation, and Sheila's advancing of funds of over $180,000.00 for the home repair and maintenance and care for Hattie. (Id.).

48.     The attorney ad litem, Berlinger, placed into the record communications between counsel where, shortly after her appearance, he summarily instructed Sheila's counsel to dismiss Sheila' application because she would not be appointed as guardian. (2 CR 264). The same correspondence contained the recitation of Berlinger telling Sheila's counsel that he was not going to read the accounting she provided. (2 CR 249). Berlinger also referred to Sheila's counsel as "delusional" in a court filing. (2 CR 243).

49.     In October, the criminal investigation Aisha instigated against Sheila was closed. (2 CR 255). At the end of the month, Hattie suffered a stroke. 3 The record shows 2015 was the earliest bank records available in the limited time between counsel's appearance and the hearing.  A few days later Adult Protective Services formally found that it could not determine any financial mismanagement had occurred. (2 CR 215).

**Motion to Dismiss Guardianship**

50.     In November 2018, Sheila filed a motion to dismiss the guardianship. (2 CR 191). The basis was that no financial mismanagement had occurred and the less restrictive alternatives in place were adequate to provide for Hattie. Those included the power of attorney and joint management bank accounts.

(2 CR 199, 209). She requested a hearing on that motion. (2 CR 232). That hearing was never held.

51.     In December 2018, appointees Drexler, Shannon and Berlinger, filed a joint objection to the accounting filed by Sheila. (2 CR 271). The document asserted that at the December 20, 2017 hearing Sheila was "instructed to provide receipts, source and invoice documents to substantiate expenditures and actions of the agent." (Id.). The record of that hearing does not support the statement and no order to that effect was ever signed. The appointees alleged the accounting did not comply with sections 751.101-.104 of the Estates Code. The relevant section, 751.104, only applies when a principal demands an accounting and that had not occurred.

## Termination of the Guardianship

52.     On January 1, 2019, Hattie Owens died. (3 CR 323). Thirty days later the Temporary Guardian, Drexler, filed her first of three "final account" of the temporary guardianship. (2 CR 276). She also filed an application for payment of $53,468.00 in fees and expenses. (2 CR 283). Shortly thereafter the guardian ad litem, Berlinger, filed an application for payment of $13,196.38 in fees and expenses. (2 CR 331). The Attorney ad litem, Shannon, filed an application for payment of $15,000.00 in fees. (2 CR 346). Counsel for Aisha became the judge of the court where the case was pending so the matter was transferred to Probate Court No. 2. (2 CR 345).

53.     Even though Hattie had died, and Ms. Shannon had been appointed as attorney ad litem, on February 22, 2019, the trial court appointed another

attorney ad litem for Hattie. (3 CR 5). Within a month that appointee, Geoffrey Sansom, filed a one-page report (3 CR 8) and a request for fees in the amount of $1,274.00. (3 CR 10).

### Challenges to the Accounting and Fees

54.     In March 2018 Sheila moved to strike the objections of the appointees, objected to the requests for fees of the appointees, and objected to the temporary guardian's final account. (3 CR 13). The challenge to the appointees' fee requests was based on failure to perform their respective duties which, if performed properly, would have resulted in termination of the proceeding much earlier. She also challenged the fees as excessive. In support Sheila offered an expert report addressing duties and deficiencies of the appointees. (3 CR 37). Drexler filed a response to the objection (3 CR 77). She also filed an amended final account. (3 CR 83).

55.     The objections to the fee applications and final accounting were heard April 29, 2019. In addition to parties Sheila Collins, Aisha Ross, and counsel for Angela Sapp, the Attorney ad Litem and guardian ad litem, appeared. The temporary guardian did not appear due to medical issues but yet another attorney appeared for her, Gus Tamborello. The only two witnesses were an expert in guardianship, Rebecca Dyann McCully for Sheila, and the attorney ad litem, Sansom.

56.     Ms. McCully testified to her extensive experience and qualifications in the area of Texas guardianship law. (4/29/19 – 1 RR 22-26). Through the voluminous objections of Tamborello, McCully testified to the duties of an attorney ad litem (4/29/19 1 RR 55), guardian ad litem (Id. at 67) and

temporary guardian. (Id. at 80). She detailed the deficiencies in the performance of the appointees in this case and that they were not entitled to the fees claimed.

57.     The common element was the appointees' failure to take any actions to carry out the desire of Hattie to avoid guardianship. (Id. at 60, 70). None had undertaken any investigation of the claim of financial mismanagement Aisha made against Sheila. Because that was the basis of the original application, had they done so, the guardianship could have been resolved early on. (Id. at 55, 60, 63, 66, 70- 72).

58.     She also addressed the fee applications. With regard to the application of Drexler, the court required her to identify each challenged item in the 36- page billing records. (Id. at 120-164). The hearing concluded without a ruling. (Id. at 247).

59.     The day after the hearing Berlinger filed an application with the court for additional fees in the amount of $4,462.50 which covered a three-month period prior to the hearing. (3 CR 92). Sansom filed an application for payment of $1,764.00 (3 CR 97), and Drexler filed an application for an additional $4,200.00 in fees to be paid to Tamborello. (3 CR 105).

**The Trial Court Awards $90,000 in Fees**

60.     Without any express ruling on Sheila's objections to the fee requests, the trial court began signing orders awarding fees on May 3, 2019. He signed orders awarding fees of $15,000.00 to Shannon for (3 CR 102), $13,196.38 to

Berlinger (3 CR 103), and $53,468.00 to Drexler. (3 CR 104). The court clerk did not send notice of these orders to the parties in accordance with Rule 306a.

61.     May 28, 2019, Drexler filed a second amended final account. (3 CR 113). The document did not address many of the deficiencies identified by McCully, but did remove Hattie's home from the inventory, agreeing that ownership had been transferred to a trust before the death of Hattie's husband. Significantly, the document was not signed.

62.     On May 29, 2019, the trial court signed six more orders. They awarded additional fees to Sansom (3 CR 130, and 135), Berlinger (3 CR 127), and Tamborello (3 CR 135).

63.     Even though the final account filed by Drexler was not signed, the trial court signed an order approving that final account and all of the fees requested. (3 CR 138). It signed a separate order dropping the case from the court's docket. (3 CR 137). Again, the clerk did not give notice of these orders, including the final order. In the month of May, 2019 the court ordered payment of $93,410.38 from Hattie's estate for a guardianship proceeding she opposed.

**Post-Judgment Proceedings**

64.     Sheila eventually learned of the orders, filed a motion to extend postjudgment deadlines under Rule 306a(4) (3 CR 143) and motions for new trial June 28, 2019. (3 CR 165). She gave notice of appeal on July 12, 2019. (3 CR 209).

65.     The trial court conducted a hearing on post-judgment motions September 17, 2019. It found Sheila did not get timely notice of some of the orders and the extended deadlines of Rule 306a(4) applied. (Supp. CR 8). It denied her motion for new trial. (Supp. CR 7). It also refused to make requested findings of fact and conclusions of law. (9/17/19 RR 12).

66.     The summary of Plaintiff claim was that the Texas Estates Code permits a court to appoint attorneys and others to fulfill specific statutorily defined roles in a guardianship proceeding. Those roles are designed to protect the rights of proposed wards, including the right to avoid being subject to the burden of living under the control of a guardian if they object to guardianship and the applicant for guardianship does not meet their burden. If those appointed by a court do not fulfill their duties, not only are the rights of proposed wards burdened by an unnecessary guardianship, their estate is burdened by the cost of an unnecessary guardianship.

67.     The volume of guardianship proceedings in Harris County not only supports specialized probate courts, it supports counsel with practices that derive significant funds from court appointments in various roles in guardianship proceedings. This case illustrates the failure of judicial supervision to ensure those counsel fulfill their statutory duties, including diligently investigating and seeking to carry out a client's desire to avoid guardianship.

68.     The record here is clear that the proposed ward opposed guardianship. (1 CR 37; 12/20/17 RR 23). She understood the need for assistance and put in place statutorily recognized alternatives to guardianship. (1 CR 128; 12/20/17

RR 24-25). Nevertheless, multiple court appointees took no action to oppose the application or conduct any investigation into the basis for the allegation. Several affirmatively stated they had no duty to do so. (4/19/19 RR 52).

69.     The record reflects the response of the court's appointees when their performance is questioned. The record affirmatively reflects personal attacks by court appointed attorneys, describing a party opposing guardianship in derogatory terms and their counsel as "delusional" in statements to the court and court filings. (2 CR 242; 4/29/19 RR 43). The record reflects repeated admonitions by the trial court to act with civility. (4/29/19 – 1 RR 172-73, 201).

70.     Appellant challenges the award of approximately $90,000.00 of her mother's estate to court appointees for a temporary guardianship that lasted just over a year.

**Points of Error**

71. Plaintiff noticed the below errors of the judge exercise of his functions.

    a.  The trial court abused its discretion in awarding almost $20,000.00 to the Guardian Ad Litem who had not properly performed the duties of that role and whose fees were not reasonable and necessary.

    b.  The trial court abused its discretion in awarding over $53,000.00 to the Temporary Guardian who had not properly performed the duties of that role and whose fees were not reasonable and necessary.

c. The trial court erred in approving the Second Amended Final Account of the Temporary Guardian.

d. The trial court erred in awarding fees for services to the temporary guardian for her own interest.

e. The trial court abused its discretion and awarding $15,000 to the attorney ad litem who had not properly performed the duties of that role and whose fees were not reasonable and necessary.

## COUNT I

## <u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>

72.    Plaintiff hereby re-alleges paragraphs 1 through 70 as if specifically set forth.

73.    The conducts of Defendant as set forth above were so extreme and outrageous that it exceeded the boundaries of human decency and was beyond pale of conduct tolerated in a civilized society. These conducts were intended to cause severe emotional distress, or were done in reckless disregard of the probability of causing severe emotional distress.

74.    As an actual and proximate result of Defendants' wrongful conduct, Plaintiff has suffered and continues to suffer severe and continuous

humiliation, emotional distress, and physical and mental pain and anguish, all to his damage in an amount according to proof at the time of trial.

75.      Defendant committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, and acted with an improper and evil motive amounting to malice and in conscious disregard of Plaintiff's rights. Because the acts taken toward Plaintiff were carried out by Defendant acting in a deliberate, cold, callous, and intentional manner in order to injure and damage Plaintiff, Plaintiff is entitled to recover punitive damages from Defendant in an amount according to proof.

# COUNT II
## <u>VIOLATIONS OF RIGHTS SECURED BY THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT</u>
### (42 U.S.C. § 1983)

76.      Plaintiff hereby re-alleges paragraphs 1 through 70 as if specifically set forth.

77.       Plaintiff is a member of a class in the society and was unlawfully discriminated against because of her religion, age or person.

78.      Plaintiff was similarly situated in all relevant aspects to other persons in the courtroom.

79.     Nevertheless, Defendant failed to give plaintiff equal opportunity in order to defend herself in the court room and other similar conducts as alleged above. All of the actions taken by Defendant were done while acting under color or state of law and had the effect of depriving Plaintiff of rights secured by the Constitution and laws of the United States, specifically the Equal Protection Clause of the Fourteenth Amendment to the United States.

80.     As the direct result of Defendant's actions as alleged herein, Plaintiff has been irreparably, materially, and substantially harmed and damaged in an amount to be proven at trial.

81.     Defendant's actions were willful, wanton, intentional and in knowing violation of his obligations and duties under 42 U.S.C. § 1983 and were taken with the callous disregard of the probable detrimental, emotional and economic consequences to the Petitioners. Therefore, Plaintiff is entitled to recover punitive damages to Punish Defendant and to deter him and others from such conduct in the future. Wherefore, Plaintiff prays for judgment against the Defendant, for compensatory and punitive damages, for an award of costs, including a reasonable attorney's fee, and for such other and further relief as is just.

## COUNT III

## <u>VIOLATION OF TITLE II OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C § 2000a</u>

82.     Plaintiff hereby re-alleges paragraphs 1 through 70 as if specifically set forth.

83.     "One of the purposes of the public accommodations provisions of the Civil Rights Act of 1964 was to eliminate the unfairness, humiliation, and insult of racial discrimination in facilities which purport to serve the general public." Rousseve v. Shape Spa for Health & Beauty, Inc., 516 F.2d 64, 67 (5th Cir. 1975) (citing H.R. Rep. No. 914, 88th Cong., 1st Sess., 18 U.S.C. Cong. & Admin. News 1964, p. 2355); Daniel v. Paul, 395 U.S. 298, 307-8 (1969) (citing H.R. Rep. No. 914, 88th Cong., 1st Sess.).

84.     Title II prohibits discrimination based on protected categories, including race, creed, color or religion, in the provision of "full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation." 42 U.S.C. § 2000a.

85.     Defendant discriminated against Plaintiff on the basis of HER race, creed, color or religion, in violation of Title II.

86.     Defendant denied Plaintiff the full and equal enjoyment of its public accommodation on the basis of their race, creed, color or religion in violation of Title II.

87.     Defendant excluded the Plaintiff from enjoying an environment at a place of public accommodation that is free from a hostile and intimidating environment, in violation of Title II.

88.     By the unlawful restricting Plaintiff from accessing the court and as alleged above. Defendant denied her statutory right to "full and equal enjoyment" of a public accommodation.

89.     Defendant's actions were willful, wanton, intentional and in knowing violation of their obligations and duties under Title II of the Civil Rights Act and were taken with the callous disregard of the probable detrimental consequences to the Plaintiff.

90.     Plaintiff seeks all relief available to them under Title II and pursuant to 42 U.S.C. § 2000a-3.

91.     Wherefore Plaintiff demands declaratory relief, and an injunction against Defendant prohibiting it from discriminating against individuals based on their race, color, ethnicity, or ancestry, restraining Defendant from instituting any policies or practices that discriminate or segregate people on the basis of race as well as attorneys' fees and costs pursuant to 42 U.S.C. § 2000a-3(b), and any other relief deemed appropriate by the Court.

## COUNT IV

## <u>VIOLATION OF 42 U.S.C. § 1981</u>

92.     Plaintiff hereby re-alleges paragraphs 1 through 70 as if specifically set forth.

93.     Under Section 1981 of the Civil Rights Act of 1866, "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." 42 U.S.C § 1981(a).

94.     Pursuant to plaintiff's allegations above, Defendant denied her statutory right of equal benefit and equal protection.

95.     Defendant's actions were discriminatory, arbitrary, and capricious, and constituted a disparity in treatment.

96.     By the actions described herein, Defendant deprived Plaintiff of the equal enjoyment of the benefits, privileges, terms, and conditions of a contractual relationship on the same basis as the others.

97.     Further, because Defendant's discrimination was intentional, Plaintiff have a cause of action under the equal benefits clause of Section 1981.

98.     Defendant excluded Plaintiff from enjoying an environment at a place of public accommodation that is free from a hostile and intimidating environment, in violation of Section 1981.

99.     As a proximate result of the actions of Defendant as described herein, Plaintiff has suffered, continues to suffer, and will, in the future, suffer great

and irreparable loss and injury including, but not limited to, humiliation, embarrassment, emotional distress, and mental anguish.

100.  Defendant's actions were willful, wanton, intentional and in knowing violation of their obligations and duties under 42 U.S.C. § 1981 and were taken with the callous disregard of the probable detrimental, emotional and economic consequences to the Plaintiff. Therefore, Plaintiff is entitled to recover punitive damages to Punish Defendant and to deter it and others from such conduct in the future. Wherefore, Plaintiff prays for judgment against the Defendant, for compensatory and punitive damages, for an award of costs, including a reasonable attorney's fee, and for such other and further relief as is just.

## COUNT V
## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

101.  Plaintiff hereby re-alleges paragraphs 1 through 70 as if specifically set forth.

102.  Plaintiff had a reasonable probability of future business opportunities and economic benefit in connection with its relationships with its customers.

103.   Defendant had knowledge of such opportunities and intentionally interfered with such opportunities in violation of Plaintiff's right.

104.    Defendant's committed these tortious acts with deliberate and actual malice, ill-will, and oppression in conscious disregard of Plaintiff's legal rights.

105.    Defendant's actions have disrupted Plaintiff's relationships and business opportunities with its customers.

106.    The aforementioned acts of Defendant constitute a tortious interference with prospective economic advantage and relations.

107.    Plaintiff has suffered and will continue to suffer damages due to Defendant's tortious interference with its prospective economic advantage.

108.    As the direct result of Defendant's actions as alleged herein, Plaintiff has been irreparably, materially, and substantially harmed and damaged in an amount to be proven at trial.

## COUNT VI

## <u>NEGLIGEN   INTERFERENCE   WITH   PROSPECTIVE ECONOMIC ADVANTAGE</u>

109.    Plaintiff hereby re-alleges paragraphs 1 through 70 as if specifically set forth.

110.     Plaintiff had a reasonable probability of future business opportunities and economic benefit in connection with its relationship with its customers.

111.     Defendant had knowledge of such opportunities and knew or should have known that if he did not act with due care, his actions would interfere with such opportunities and cause Plaintiff to lose the economic benefit of such relationships.

112.     Defendant's actions have disrupted Plaintiff's relationships and business opportunities with its customers.

113.     The aforementioned acts of Defendant constitute a tortious interference with prospective economic advantage and relations.

114.     Plaintiff has suffered and will continue to suffer damages due to Defendant's tortious interference with its prospective economic advantage.

115.     As the direct result of Defendant's actions as alleged herein, Plaintiff has been irreparably, materially, and substantially harmed and damaged in an amount to be proven at trial.

## COUNT VII
## **DECLARATORY RELIEF**

116.     Plaintiff hereby re-alleges paragraphs 1 through 70 as if specifically set forth.

117.     The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that in "a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

118.     As described above, this Court has jurisdiction over this matter, and therefore may declare the rights of Plaintiff.

119.     Plaintiff therefore seeks an order declaring Defendants' practice unlawful, and that Defendant's are liable to Plaintiff for damages caused by that practice.

## COUNT VIII
## <u>LOSS OF CONSORTIUM AGAINST ALL DEFENDANTS</u>

120.     Plaintiff hereby re-alleges paragraphs 1 through 70 as if specifically set forth.

121.     At all times relevant hereto the Plaintiff's family members ("Family Member Plaintiff") have suffered injuries and losses as a result of the Defendant's conduct.

122.     For the reasons set forth herein, Family Member Plaintiff have necessarily paid and have become liable to pay for medical aid, treatment, and medications, and will necessarily incur further expenses of a similar nature in the future as a proximate result of the Defendant's misconduct.

123.     For the reasons set forth herein, Family Member Plaintiff have suffered and will continue to suffer the loss of her loved ones' support, companionship, services, society, love, and affection.

124.     Plaintiff alleges Her Maternal relationship has been impaired and depreciated, and the relationship between Mother and Daughter has been altered.

125.     Family Member Plaintiff have suffered great emotional pain and mental anguish.

126.     As a direct and proximate result of the Defendant's misconduct, Family Member Plaintiff have sustained injuries and damages alleged herein and other damages to be proved at trial.

127.     By reason of the foregoing, Defendant is liable to Family Member Plaintiff for damages as a result of its misconduct.

## REQUEST FOR RELIEF

Plaintiff, request judgments against Defendant as follows:

A.      Declaring Defendant's actions to be unlawful; permanently enjoining Defendant's performing further unfair and unlawful acts as alleged herein;

B.      Injunctive and declarative relief that reverses the "weaponization" of the court system by the defendant, the appointed attorneys, and the disgruntled siblings against the Plaintiff and the carrying out of Hattie Owens' last wish on this earth;

C.      For all recoverable compensatory, statutory, and other damages sustained by Plaintiff, including disgorgement and all other relief allowed under applicable law;

D.      For costs;

E.      For both pre-judgment and post-judgment interest on an amount to be decided at trial;

F.      For appropriate injunctive relief, including public injunctive relief;

G.      For treble damages insofar as they are allowed by applicable laws;

H.      For appropriate individual relief as requested above;

I.     For payment of attorneys' fees and expert fees as may be allowable under applicable law;

J.     For such other and further relief, including declaratory relief, as the Court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

## RESERVATION OF RIGHTS

Plaintiff reserves its right to further amend this Complaint, upon completion of its investigation and discovery, to assert any additional claims for relief against Defendant or other parties as may be warranted under the circumstances and as allowed by law.

**Dated; October_____2020.**

Respectively Submitted by;

_____

**SHEILA OWENS COLLINS**
Maryland
Plaintiff Pro Se.

**VERIFICATION**

I, **SHEILA OWENS COLLINS**, I am the Plaintiff in the above-entitled action. I have read the foregoing Complaint for Damages and Injunctive Relief and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and, as to those matters, I believe them to be true. I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct and that this Verification was executed on **October 20, 2020, in the City Houston, County of Harris, State of Texas.**

/s/ Sheila Owens-Collins

**SHEILA OWENS COLLINS**
Maryland
Plaintiff Pro Se.